[No. F029664. Fifth Dist. Jan. 13, 2000.]

THE PEOPLE ex rel. BILL LOCKYER, as Attorney General, etc., et al., Plaintiffs and Respondents, v.
SUN PACIFIC FARMING CO. et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III. and IV. of the Disscussion.

COUNSEL

Brian C. Leighton and Donald Lescoulie for Defendants and Appellants.

Daniel E. Lungren and Bill Lockyer, Attorneys General, and Charles W. Getz IV, Assistant Attorney General, for Plaintiff and Respondent the People.

Kahn, Soares & Conway, Jan L. Kahn and Rissa A. Stuart for Plaintiffs and Respondents Central California Tristeza Eradication Agency and Kern County Citrus Pest Control District.

OPINION

**WISEMAN, J.**—The People of the State of California, the Central California Tristeza Eradication Agency and the Kern County Citrus Pest Control

District (the People) brought an action for abatement of public nuisance against Sun Pacific Farming Co.; Wallich's Ranch Co.; McFarland Ranch; Bob Reniers; South Star Ranch Co.; WCM Farm Co., Ltd.; The Corrotto Co., Inc.; Badger Farming Company, individually and doing business as Sequoia Enterprises; Woody Ranch; and Rolling Hills Ranch (Sun Pacific), among others. The trial court found that Sun Pacific's maintenance of citrus trees infected with the citrus tristeza virus (CTV) constitutes a public nuisance and issued an injunction mandating Sun Pacific to remove all CTV-infected citrus trees. Sun Pacific appeals, alleging error by the trial court in a number of pretrial rulings on the People's in limine motions and the constitutional issues raised in Sun Pacific's affirmative defenses. We affirm.

## Procedural History

On March 7, 1997, the People filed a complaint against Sun Pacific, alleging four causes of action: 1) violation of Food and Agricultural Code section 5401 et seq.,[1] 2) violation of Business and Professions Code section 17200 et seq., 3) declaratory relief, and 4) injunctive relief. Later, the People moved for a preliminary injunction restraining Sun Pacific from continuing to maintain a public nuisance. On June 16, 1997, the court denied the People's motion, finding that CTV has a lower danger of spreading in the summer months, and there was a reasonable likelihood a trial on the merits could occur before that risk increased.

The People demurred to and moved to strike portions of Sun Pacific's answer to the complaint. Sun Pacific filed its third amended answer and the matter proceeded to trial on October 7, 1997. The People filed several motions in limine to preclude evidence and testimony on relevancy grounds. The trial court granted a number of the People's in limine motions, and the parties agreed to certain facts.

In addition, at the request of the parties, the court ruled on two of Sun Pacific's affirmative defenses: 1) the unconstitutional delegation of legislative and judicial authority in violation of Sun Pacific's Fourteenth Amendment rights, and 2) the alleged violation of Sun Pacific's equal protection rights guaranteed under the Fourteenth Amendment. The trial court rejected both defenses.

The parties subsequently agreed to a stipulated judgment in favor of the People and against Sun Pacific. The court entered judgment, the terms of which provide, in relevant part:

---

[1] All statutory references are to the Food and Agricultural Code unless otherwise indicated.

"1. [Sun Pacific's] maintenance of CTV infected citrus trees on real property located in Kern County constitutes a public nuisance pursuant to the Civil Code and Food and Agricultural Code;

"2. An injunction shall issue mandating [Sun Pacific] to remove all CTV infected trees . . . ;

"3. [Sun Pacific] shall retain all rights to appeal this Judgment;

"4. As a condition to removing CTV infected trees pending an appeal, [the Kern County Citrus Pest Control District] will post a bond, if allowed or required by law, or, if no bond is allowed or required, [the Kern County Citrus Pest Control District] shall post a surety in the sum of $25.00 per tree . . . ;

"5. The second cause of action alleging violations of the Business and Professions Code, brought by [the People] shall be bifurcated from this case, and no judgment shall be rendered at this time, in the interest of justice. Said case shall be held in abeyance pending the outcome of [Sun Pacific's] appeal. If the appeal is successful and [Sun Pacific] prevail[s], the People shall dismiss with prejudice the Second Cause of Action, and all claims and remedies sought based upon unfair business practices. Further, if [Sun Pacific's] trees are removed pending resolution on appeal and upon timely notice of the same, the [People] agree to dismiss, with prejudice the Second Cause of Action and all claims and remedies sought based upon unfair business practices. If, however, the matter is remanded back to this court for further proceedings on the merits, and trees have not been removed pursuant to the injunction, the [People] shall retain the right to renew and bring to trial the causes of action based upon unfair business practices.[2]

"6. [Sun Pacific] may make a further Offer of Proof in writing to this court, as to what would have been established had the court's rulings not been entered the way they were . . . ."

Sun Pacific filed a supplemental offer of proof and a timely notice of appeal.

---

[2]We note that as a result of the trial court's bifurcation and "abeyance" of the second cause of action, the judgment is not final and subject to dismissal as a nonappealable interlocutory order. (See *Hill v. City of Clovis* (1998) 63 Cal.App.4th 434, 442-443 [73 Cal.Rptr.2d 638] [no exception to one final judgment rule when parties craft stipulations that allow remaining causes of action to survive to trial].) Nonetheless, we will treat the purported appeal as a petition for writ of mandate, and address the merits. (See *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 744-745 [29 Cal.Rptr.2d 804, 872 P.2d 143]; *Voss v. Superior Court* (1996) 46 Cal.App.4th 900, 906 [54 Cal.Rptr.2d 225].)

*Factual History*

A. *Citrus Pest District Control Law*

California has enacted specific laws to address the control of all types of citrus pests. The Citrus Pest District Control Law (Pest Control Law), codified at section 8401 et seq., provides a procedure "for the organization, operation, government, and dissolution of districts for the more effective control and eradication of citrus pests." (§ 8402.) A citrus pest is defined to include "any infectious, transmissible, or contagious disease, any form of animal life, or any form of vegetable life infesting citrus trees or citrus fruits." (§ 8406.)

Since the Pest Control Law is not widely known, we now devote space to the review of sections generally relevant to resolution of this case. Pest control districts are formed by a petition, which must be signed by landowners that hold at least 51 percent of the citrus acreage in the district. (§ 8451.) The county board of supervisors then declares the district to be duly organized after notice and hearing, finding "the project is feasible and in the interest of the citrus growers of the county[.]" (§ 8463; see also §§ 8455-8460.) The district is governed by a five-person board of directors, appointed by the board of supervisors for the county in which the district is located. (§ 8501.) In order to serve as a district director, a person must own lands within the district which are devoted to growing the product for which the district is established. (§ 8502.)

Pest control districts have numerous powers. They include the power to sue and be sued; to hold and dispose of real and personal property; to cause assessments to be levied to pay district obligations; to enter into contracts; and to employ persons necessary to carry out the purposes and powers of the district. (§ 8551.) Additionally, districts can "[e]radicate, remove, or prevent the spread of any and all citrus pests"; "[e]nter into or upon any land included within the boundaries of the district for the purpose of inspecting and treating the citrus trees and other host plants and fruit grown on them;" and "[p]erform any and all acts either within or outside the district necessary or proper to fully and completely carry out the purposes for which the district was organized." (*Ibid.*) Pest control districts are permitted to compensate for the removal of any citrus tree infected with CTV. The maximum amount of compensation is $25 per tree, with a $3,000 cap per geographical acre. (§§ 8553, 8555.)

The board of directors is required to "formulate an effective plan based on the best known and accepted methods for the control and eradication of the

citrus pests within the district." (§ 8557.) It must also estimate the costs of operating the plan for the next fiscal year, and adopt a preliminary budget of expenditures for that year. (§§ 8558-8559.) A hearing must be held by the board on its annual budget. (§§ 8560, 8568.) Further, the board must file its final budget for each fiscal year with the board of supervisors, which then levies an assessment upon all the citrus trees in the district. (§ 8604.)

Landowners can dissolve the district by petition. It must be signed by landowners that hold at least 60 percent of the citrus acreage in the district. (§ 8751.) The board of supervisors for the county in which the pest control district is located dissolves the district after notice and hearing, and must find that "dissolution of the district will benefit the citrus industry of the county." (§ 8756; see also §§ 8752-8755.)

The Kern County Citrus Pest Control District (District) was formed pursuant to the Pest Control Law.

### B. CTV

CTV is a virus transmitted by aphids, and it infects most types of citrus. It exists in several strains and is found throughout the world, including California. Most strains cause trees growing on sour rootstock to die within months of infection. Approximately 10 to 20 percent of the citrus trees in the San Joaquin Valley are on sour rootstock. The remaining trees are grown on hybrid rootstock and are more tolerant to the effects of the disease. Adverse consequences of CTV infection on tolerant trees include stem-pitting, chlorosis, loss of productivity, and reduced fruit size. Trees infected with CTV may serve as a source of infection for other healthy trees, and removal is the only effective virus eradication strategy currently available.

The People contend CTV-infected trees pose a serious risk of infecting neighboring citrus properties and threaten the health and welfare of the citrus industry in the Central Valley. Sun Pacific maintains CTV does not affect the growth, yield, nutritional value, flavor, size or color of oranges grown on tolerant rootstock.

### C. Central California Tristeza Eradication Agency

The Government Code provides a procedure that allows public agencies to enter into agreements which jointly exercise their powers on a regional basis. (See Gov. Code, § 6500 et seq.) In 1963, the West Fresno County Red Scale District, the Central Valley Pest Control District, the Tulare County Pest Control District, the Southern Tulare County Citrus Pest Control District,

and the District, entered into an "Agreement for Joint Operations of the Tristeza Eradication Program." Thus was born the Central California Tristeza Eradication Agency (the Agency). The Agency's purpose is to: 1) identify and eradicate CTV in a timely and cost-effective manner, and 2) encourage and support research programs to assist in eliminating the threat of CTV.

Since 1963, the joint powers agreement has been amended. In July 1995, the latter four districts signed another agreement that extended the Agency's operation for an additional three-year term. Pursuant to the 1995 joint powers agreement, each participating district appointed one representative to the Agency's board. In addition, each district with a citrus acreage in excess of 15,000 acres appointed one additional representative for every 15,000 acres of citrus trees in the district.

In July 1995, based on the conclusions of several plant pathologists and virologists that suppression of CTV was feasible in the Central Valley, the Agency prepared a three-year plan on how best to do so. The plan called for the identification and removal of CTV-infected citrus trees. Monitoring would occur through an annual systematic sub-sampling of 10 percent of total acreage to be randomly selected. The Agency collected samples from every commercial citrus grove within its jurisdiction and tested for CTV. If a sample tested positive, the Agency performed additional testing to locate all infected trees within a grove. The infected trees were then removed by the grower voluntarily or, if the grower chose not to comply, by the Agency through court action.

The Agency was authorized, but not required, by statute to pay compensation up to $25 per tree removed as part of the pest eradication program, with a $3,000 cap per acre. (§§ 8553, 8555.) The Agency provided the following compensation and removal expense scale for tree removal: for trees with an infection level between 0 and 5 percent, $0 compensation, and $35 per tree removal expense; for an infection level between 5 and 10 percent, $25 per tree compensation, and $35 per tree removal expense; for an infection level between 10 and 20 percent, $25 per tree compensation, and $50 per tree removal expense; and for an infection level between 20 and 100 percent, $25 per tree compensation, and $55 per tree removal expense. In the event the infection level was 20 percent or higher, the Agency allowed the grower to elect whole grove removal with compensation of $5,500 per net citrus production acre. In contrast, Sun Pacific maintains just compensation for removal of a citrus tree grown on tolerant rootstock is over $150 per tree.

In February 1996, the Tulare County Pest Control District, which represents the largest amount of citrus acreage in the San Joaquin Valley,

withdrew from the Agency. As a result, Sun Pacific contends Tulare County now has no eradication program, no forced tree removal, and a substantially reduced assessment level despite the fact it has the highest level of CTV infection.

### D. CTV infection of Sun Pacific trees

In December 1995, the Agency gave Sun Pacific notice of its request to enter onto Sun Pacific's land and inspect for CTV. Sun Pacific denied the request, and the Agency obtained inspection warrants for the real property owned or operated by Sun Pacific. Testing was completed in early 1996. Over 7,000 trees on Sun Pacific's property tested positive for CTV. Notices of infection were then sent to Sun Pacific identifying each CTV-infected tree. Demand was made that infected trees be removed within 15 days after written notice in order to be eligible for compensation. Sun Pacific refused to comply.

During this time, petitions were circulated in the District and the Southern Tulare County Citrus Pest Control District to dissolve those districts pursuant to section 8751. The growers of over 60 percent of the citrus acreage in each of those districts petitioned their respective boards of supervisors to dissolve the districts; however, the boards did not approve the petitions. Instead, the Kern County Board of Supervisors concluded the California Environmental Quality Act (CEQA) applied and found the dissolution was subject to Local Agency Formation Commission (LAFCO) jurisdiction. The Tulare County Board of Supervisors similarly found the dissolution subject to LAFCO jurisdiction. The petitioners never pursued the matter with LAFCO.

For purposes of this action, the parties agreed to the following facts: 1) citrus trees were planted, and CTV is a pest within the meaning of the Food and Agricultural Code; 2) the District and/or the Agency tested Sun Pacific's citrus trees and found them to be infected with CTV; 3) the District and/or the Agency issued lawful notices to remove the CTV-infected trees; 4) Sun Pacific refused to remove the trees; and 5) CTV is subject to abatement by the District and/or the Agency under the Civil Code and the Food and Agricultural Code.

### Discussion

Sun Pacific challenges a number of the trial court's rulings relating to its affirmative defenses and the People's in limine motions. It also argues the judgment should be reversed because: 1) the People did not sue under the

applicable statutes; and 2) the trial court did not award Sun Pacific just compensation for tree removal.

## I. Constitutionality of the Pest Control Law

Sun Pacific maintains the trial court erred in rejecting its 14th and 15th affirmative defenses as a matter of law. Sun Pacific's 14th affirmative defense generally alleges there is no authority to prosecute this case. The allegation reads as follows: "[The Agency and the District] lack the legal authority to prosecute this action or take any other action against [Sun Pacific] because whatever authority was granted to the Agency and/or [the District] it was unconstitutionally delegated in violation of [Sun Pacific's] Fourteenth Amendment rights because: (1) the legislative authority was delegated to citrus growers who were directly interested in the operation of the regulatory rules and their penal provision; (2) there are no clear legislative guidelines for the exercise by the Agency and the District of the delegated authority; (3) it is these private self-interested parties that determine the budgets, the assessment rate, whether there will be forcible tree removal, whether and to the degree of the testing of the CTV virus, whose trees must be removed and whose don't, the order of the removal and whether to bring an action against fellow growers for the forced removal of trees; and (4) the state presumably delegated to the growers in the county the authority to begin a Pest Control District and once established the Board of Supervisors appoint the members of [the District] Board, [the District] Board members, all of whom are citrus growers and thus competitors of [Sun Pacific]—then choose the members of the Agency, the Agency then determines the 'effective plan', and [the District] Board members can decide whether they will withdraw from the Agency, join the Agency, refuse to force growers to pull out trees or agree to force growers to pull out trees, all with no legislative or executive branch guidelines, rules, scrutiny or oversight."

Sun Pacific's 15th affirmative defense alleges a violation of its equal protection rights. It contends: "[A]ny action taken against [Sun Pacific] . . . would constitute a violation of [Sun Pacific's] equal protection rights guaranteed under the Fourteenth Amendment . . . because: (1) the . . . Complaint alleging that [Sun Pacific's] alleged CTV-infected trees must be removed because they constitute a public nuisance and that maintaining them would constitute an unfair business practice unequally penalizes and burdens [Sun Pacific] because CTV infected trees in neighboring Pest Control Districts, neighboring counties, and in Southern California are not required to be removed, are not being ordered removed and the growers of those trees are free to market oranges from those CTV infected trees; (2) the

neighboring Pest Control Districts have a far reduced assessment level than the assessment level imposed on Kern County citrus growers; and (3) because the spread of the virus is primarily caused by the cotton and melon aphids, which are the preferred crop hosts of these aphids yet there are no state, district or local efforts to eradicate cotton, melons or the aphids that allegedly causes the spread of CTV."

## A. Standard of review

■ Constitutional issues, such as due process and equal protection challenges, are reviewed de novo. (*State of Ohio v. Barron* (1997) 52 Cal.App.4th 62, 67 [60 Cal.Rptr.2d 342].) Appellate courts also independently determine the proper interpretation of a statute. (See *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].)

Because the trial court's ruling on Sun Pacific's 14th and 15th affirmative defenses involves constitutional challenges and statutory interpretation—purely questions of law—we apply the de novo standard of review and give no deference to the trial court's ruling. (See *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799-801 [35 Cal.Rptr.2d 418, 883 P.2d 960]; *Stratton v. First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].)

## B. Constitutional delegation of legislative and judicial authority

■ Sun Pacific contends the Pest Control Law unconstitutionally delegates legislative and judicial authority to a limited number of citrus growers on the boards of the District and the Agency. It complains these entities determine budgets, assessment rates, tree removal policies and litigation actions, without governmental oversight or guidance. Upon review we find no improper delegation of legislative or judicial power.

### 1. Delegation of legislative authority

■ Once the Legislature has established the law, it may properly delegate the authority to administer or apply the law to private or governmental entities. (*Wilkinson v. Madera Community Hospital* (1983) 144 Cal.App.3d 436, 442 [192 Cal.Rptr. 593].)

"An unconstitutional delegation of legislative power occurs when the Legislature confers upon an administrative agency unrestricted authority to make fundamental policy decisions. [Citations.] 'This doctrine rests upon the premise that the legislative body must itself effectively resolve the truly

fundamental issues. It cannot escape responsibility by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions.' [Citation.]" (*People v. Wright* (1982) 30 Cal.3d 705, 712 [180 Cal.Rptr. 196, 639 P.2d 267]; see also *State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 750 [16 Cal.Rptr.2d 727].) "An administrative agency cannot by its own regulations create a remedy which the Legislature has withheld." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1389 [241 Cal.Rptr. 67, 743 P.2d 1323].)

Thus, "[a]n unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy." (*Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 190 [197 Cal.Rptr. 284, 672 P.2d 1297].) As we explained in *Wilkinson*: "In order to avoid an unlawful delegation of its authority, the Legislature must first resolve the 'truly fundamental issues,' and must then 'establish an effective mechanism to assure the proper implementation of its policy decisions.' [Citation.] [¶] Thus, a delegation of authority must be accompanied by safeguards which insure that the delegatee does not act arbitrarily. [Citation.] In a proper case, however, the requisite safeguards may be implied by the statutory purpose. [Citation.] In fact, 'it is common for the courts to imply them. [Citation.]' [Citation.]" (*Wilkinson v. Madera Community Hospital, supra*, 144 Cal.App.3d at p. 442.)

 In support of its assertion that the Pest Control Law improperly delegates legislative authority, Sun Pacific makes two principal arguments. First, private self-interested citrus growers (who comprise the District's board of directors) determine budgets, assessment rates, the applicability of forcible tree removal, the degree of testing for CTV infection, and whether to bring judicial action for noncompliance with tree removal orders. Therefore, these growers presumably set policy. Second, Sun Pacific argues there are no clear legislative guidelines for the exercise of the delegated authority by the District and no governmental oversight. We reject both contentions.

In addressing whether the Pest Control Law constitutes an improper delegation of legislative authority, we look to the statute, and conclude the Legislature did not delegate a policymaking function to the pest control districts. Section 8402 sets forth the purpose of the Pest Control Law—"to make available a procedure for the organization, operation, government, and dissolution of districts for the more effective control and eradication of citrus pests," whichever products the district is established to protect. (See also § 8557 [formulation of plan based on "best known and accepted methods"

for control and eradication].) The statute also expressly provides for the eradication of CTV through the removal of infected trees. (§§ 8551-8554.) Thus, the Legislature, pursuant to its legislative policymaking power, resolved the fundamental issue that the best interests of society would be served by the control and eradication of citrus pests, such as CTV.

The observation of the California Supreme Court over 30 years ago in *Kugler v. Yocum* (1968) 69 Cal.2d 371, 384 [71 Cal.Rptr. 687, 445 P.2d 303], is noteworthy: "Doctrinaire legal concepts should not be invoked to impede the reasonable exercise of legislative power properly designed to frustrate abuse. Only in the event of a total abdication of that power, through failure either to render basic policy decisions or to assure that they are implemented as made, will this court intrude on legislative enactment because it is an 'unlawful delegation,' and then only to preserve the representative character of the process of reaching legislative decision."

In this case, we do not have a total abdication of legislative power to the pest control districts. To the contrary, the Legislature made basic policy decisions with respect to the control and eradication of citrus pests, through the best known and accepted methods.

The Legislature also provided sufficient safeguards to prevent the pest control districts from exercising their regulatory power arbitrarily. It is true that more stringent and specific standards are required, where representatives from private industry serve on administrative boards with power to make rules affecting their competitors. (*State Bd. of Education v. Honig, supra*, 13 Cal.App.4th at p. 751; see also *State Board v. Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436, 448-449 [254 P.2d 29]; *Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1, 8-15 [97 Cal.Rptr. 431].) In this case, specific standards and safeguards are provided in the statute for both the formation of the pest control districts and the exercise of their authority.

We review the protections built into the Pest Control Law. Pest control districts can only be formed if the requisite number of landowners within the district sign a petition. (§ 8451.) Further, the county board of supervisors must determine "the project is feasible and in the interest of the citrus growers of the county[.]" (§ 8463.) Prior to approval, the board of supervisors must set the matter for a public hearing and refer the petition for an investigation and report. (§§ 8455-8459.) The district's directors are appointed to four-year staggered terms, and rotate off the board on a periodic basis. (§§ 8501, 8506.) Lastly, the district can be dissolved if a petition is signed by landowners that hold at least 60 percent of the citrus acreage in the district, *and* the board of supervisors approves the petition. (§ 8751.)

The Pest Control Law also sets forth specific standards to guide the district in its operations. The district's board is required to "formulate an effective plan based on the best known and accepted methods for the control and eradication of the citrus pests within the district." (§ 8557.) The board is required to prepare a budget, including the cost of operating the plan, and to hold a noticed, public hearing. (§§ 8558-8563.) Any owner of citrus acreage in the district may make written protests to the budget, and the board must pass on all protests before adopting a final budget. (§§ 8564-8566.)

The general powers of the board are enumerated in the statute and include the eradication, removal and prevention of the spread of citrus pests and the performance of any acts "necessary or proper to fully and completely carry out the purposes for which the district was organized." (§ 8551.) The Legislature also provided that the pest control districts are permitted, but not required, to compensate for the removal of any citrus tree infected with CTV, and set forth the maximum amounts of compensation. (§§ 8553, 8555.) It is difficult to see how the Legislature could have provided more specific direction for the implementation of its policies.

We find nothing in the Pest Control Law that gives the districts arbitrary powers. To the contrary, district powers are logical, natural and necessary to the accomplishment of the purposes of the law—to control and eradicate citrus pests. We conclude the Pest Control Law provides adequate standards to guide the districts. Consequently, the delegation of legislative power is valid.

### 2. *Delegation of judicial power*

It is well settled that nonjudicial boards and officers may be vested with "quasi-judicial" power to determine facts and exercise discretion. (*East Bay M. U. Dist. v. Dept. of P. Wks.* (1934) 1 Cal.2d 476, 479 [35 P.2d 1027]; *Gaylord v. Pasadena* (1917) 175 Cal. 433, 436-438 [166 P. 348].) However, the exercise of quasi-judicial power requires an impartial decision maker. (*B. C. Cotton, Inc. v. Voss* (1995) 33 Cal.App.4th 929, 954 [39 Cal.Rptr.2d 484].) As a result, legislative attempts to confer quasi-judicial power upon interested parties, such as boards comprised of industry representatives, have been condemned. (*Id.* at p. 954, fn. 18; see also *Nissan Motor Corp. v. New Motor Vehicle Bd.* (1984) 153 Cal.App.3d 109, 113-116 [202 Cal.Rptr. 1].)

The issue thus becomes whether the Pest Control Law delegates judicial or quasi-judicial authority to pest control districts. Sun Pacific argues the Legislature did not mandate the removal of CTV-infected trees. Instead, it conferred quasi-judicial power upon the districts, which determine

with no governmental oversight, whose trees will be removed and what, if any, compensation shall be paid.

We begin our analysis with a review of basic concepts. ▮▮▮ Quasi-judicial power is defined as "[a]n administrative agency's power to *adjudicate* the rights of those who appear before it." (Black's Law Dict. (7th ed. 1999) p. 1190, italics added.) "The essential characteristic of [a] quasi-judicial body is its fact finding power and the concomitant requirement to make a determination or adjudication of fact in connection with matters properly submitted to it after a hearing." (*Le Strange v. City of Berkeley* (1962) 210 Cal.App.2d 313, 323 [26 Cal.Rptr. 550]; see also *People v. Sims* (1982) 32 Cal.3d 468, 479-480 [186 Cal.Rptr. 77, 651 P.2d 321], declined to follow on other grounds in *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 349-350 [272 Cal.Rptr. 767, 795 P.2d 1223, 2 A.L.R.5th 995] [factors indicating administrative proceedings and determinations possessed a "judicial character" relevant in determining whether agency acted "in a judicial capacity"].) However, the fact an administrative officer exercises judgment and discretion in the performance of his or her duties *does not* make these actions or powers judicial in character. (*East Bay M. U. Dist. v. Dept. of P. Wks., supra*, 1 Cal.2d at p. 479 [judicial act is one determining "what the law is and what the rights of parties are"].)

▮▮▮ The Legislature made the policy decision to control and eradicate citrus pests, including CTV. Implementation of this decision is left to the pest control districts that determine the best known and accepted methods to control and eradicate CTV. Here, the Agency decided that tree removal is the only effective virus eradication strategy currently available.[3] The Agency's decisions on how aggressively to remove trees, the timing of that removal, and whether compensation should be paid, all constitute an exercise of judgment and discretion in the implementation of the Legislature's mandate. Thus, making these decisions requires no exercise of judicial or quasi-judicial power.

Sun Pacific also argues that since the Agency and the District's board members decide whether to file suit to compel removal of CTV-infected trees, they exercise quasi-judicial power. However, the ability to file a lawsuit is not a quasi-judicial power. The Agency and the District, in filing suit, do not *adjudicate* the rights of the parties. (See *Skinner v. Coy* (1939) 13 Cal.2d 407, 418 [90 P.2d 296] [administrative officer's discretion to summarily abate agricultural nuisances, although in a strict sense judicial in nature, does not constitute delegation of judicial powers]; *Whitten v. California State Board, etc.* (1937) 8 Cal.2d 444, 446-447 [65 P.2d 1296, 115

---

[3]Interestingly, Sun Pacific has *not* suggested any other viable strategy for the eradication of CTV.

A.L.R. 1] [state agencies, such as Board of Optometry, engaged in making administrative determinations, unlike courts, have power to investigate and initiate action and find facts under which the law justifies a course of action; they do not declare the law, but perform the sole duty of ascertainment].)

We note that, citing *B. C. Cotton,* the People claim enforcement of the Pest Control Law is a valid exercise of the state's police power to abate a public nuisance. As a result, it does not unconstitutionally delegate judicial power. The People's analysis misses the mark, since it misconstrues Sun Pacific's argument and the holding in *B. C. Cotton.* In *B. C. Cotton,* growers and breeders of a new variety of cotton argued the Legislature had no power to prohibit the production of naturally colored cotton in the San Joaquin Valley. The court disagreed, finding the Legislature had such power pursuant to the state's police power and the law of public nuisance. (*B. C. Cotton, Inc. v. Voss, supra,* 33 Cal.App.4th at pp. 957-958.) In this case, Sun Pacific does not argue the Legislature had no power to mandate the control and eradication of citrus pests. Instead, it contends quasi-judicial power was unconstitutionally delegated to the pest control districts in the implementation of this mandate. Therefore, *B. C. Cotton* has no applicability here.

■ It is presumed that a statute is constitutional, and its invalidity must be clear before a court may declare it to be unconstitutional. (*Johnson v. Superior Court* (1958) 50 Cal.2d 693, 696 [329 P.2d 5].) Sun Pacific has failed to convince us the Pest Control Law contains any provision that constitutes a delegation of judicial or quasi-judicial power. Thus, we conclude the Pest Control Law does not improperly delegate judicial power, and we reject Sun Pacific's contention.

*C. Equal protection*

■ Sun Pacific next contends the Pest Control Law violates its equal protection rights under the Fourteenth Amendment. It points out that growers in neighboring pest control districts and counties were not required to remove their CTV-infected trees, were free to market fruit from those trees, and were subject to reduced assessment rates. Sun Pacific argues there was no rational basis for the Legislature to leave eradication efforts to a handful of appointed citrus growers.

■ The equal protection clause does not mandate absolute equality. Instead, equal protection merely requires that persons similarly situated with respect to the legitimate purpose of the law receive like treatment. (*In re Antazo* (1970) 3 Cal.3d 100, 110 [89 Cal.Rptr. 255, 473 P.2d 999]; *People v. King* (1992) 3 Cal.App.4th 882, 885-886 [4 Cal.Rptr.2d 723].) The traditional test is whether the distinction drawn by the challenged statute bears

some rational relationship to a legitimate state purpose. The statute " 'will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal.' " (*In re Antazo, supra*, 3 Cal.3d at p. 110.) However, when the statute affects a suspect classification or fundamental interests, it is subject to strict scrutiny. The state must then demonstrate ·that the law is justified by a compelling interest and the distinctions drawn by the law are necessary to further its purpose. (*Id.* at pp. 110-111; *People v. Applin* (1995) 40 Cal.App.4th 404, 408 [46 Cal.Rptr.2d 862].)

■ Before even considering whether to apply the equal protection standard, we first determine whether Sun Pacific is similarly situated to growers in neighboring pest control districts and counties. If it is not, Sun Pacific's equal protection challenge to the Pest Control Law must fail.

■ " '[N]either the Fourteenth Amendment of the Constitution of the United States nor the California Constitution [citations] precludes classification by the Legislature or requires uniform operation of the law with respect to persons who are different. . . . "The concept of equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." [Citations.]' [Citation.] Thus, '[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.]" (*People v. Applin, supra*, 40 Cal.App.4th at p. 409.)

■ The purpose of the Pest Control Law is "to make available a procedure for the organization, operation, government, and dissolution of districts for the *more effective control and eradication of citrus pests, whichever products the district is established to protect*." (§ 8402, italics added.) The italicized language highlights an obvious point. Different regions in the state produce different products and must contend with different citrus pests. While one citrus pest may create an imminent threat to one region of the state, it may be nonexistent in another region because of differing soil conditions, climate and agriculture. In addition, the conditions in a particular region may also influence the effectiveness of certain eradication strategies. The Pest Control Law creates a procedure for growers in individual counties to create districts for the effective control and eradication of citrus pests *within each of those districts*. It would be contrary to the purpose of the law to subject all districts in the state to the same pest control and eradication strategies.

Sun Pacific argues that its equal protection rights were violated because two districts with a high incidence of CTV withdrew from the Agency and,

as a result, their growers are no longer subject to tree removal. Sun Pacific's claim rests on the premise that the Agency's original five districts were all in the same region and sought to address eradication of the same citrus pest, CTV, and are therefore similarly situated. This argument lacks merit. Sun Pacific is not similarly situated to the growers in the two districts that withdrew from the Agency for the very reason that they opted out of the Agency. Sun Pacific, therefore, cannot be similarly situated to those growers. It would be like comparing members of an agricultural cooperative to nonmembers of the cooperative. The members generally are offered benefits and opportunities not otherwise available to nonmembers. However, members are subject to conditions and requirements in exchange for these benefits. The same holds true for members in the Agency. In exchange for benefits the Agency provides, members are subject to its conditions as well. At best, Sun Pacific is only similarly situated to the growers in those districts that still comprise the Agency. We find nothing in the Pest Control Law that provides unequal treatment for these growers.

As a result, Sun Pacific has failed to show its equal protection rights were violated.

## II. The People's motions in limine

Sun Pacific contends the trial court erred in granting the People's motions in limine to preclude evidence relating to 1) the effectiveness of the Agency's plan for the control and eradication of CTV, and 2) the petition to dissolve the District. We disagree.

### A. Standard of review

Sun Pacific maintains the trial court's ruling is the functional equivalent of an order sustaining a demurrer or a nonsuit. As a result, Sun Pacific argues that we must concede the truth of all facts presented by it, disregard conflicting evidence, and view the record in the light most favorable to Sun Pacific. The People contend the applicable standard for discretionary rulings of the trial court, such as rulings on in limine motions, is abuse of discretion.

"Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365].) This standard of review applies to a trial court's determination of the relevance of evidence, as well as to whether the evidence's probative value is substantially outweighed by its prejudicial effect. (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 32-33 [44 Cal.Rptr.2d 796]; see also *People v.*

*Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635] [trial court's ruling on Evid. Code § 352 is reviewed for abuse of discretion].) The trial court's "discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered." (*DeJesus, supra*, 38 Cal.App.4th at p. 32.)

With this standard of review in mind, we examine the two challenged evidentiary rulings at issue here.

### B. Evidence on the effectiveness of the Agency's plan

For its 16th affirmative defense, Sun Pacific alleged that, in order to prevail, the People must show compliance with the Pest Control Law, including that the District "chose the most effective plan and that the most 'effective plan' requires removal of the citrus trees." In granting the People's in limine motion to preclude evidence of the effectiveness of the Agency's plan, the trial court stated:

"I do feel that it is inappropriate for this Court to consider a challenge in particular form in this particular litigation to the efficacy of the plan that was adopted by the board.

"That does open up an unfortunate can of worms or would open up an unfortunate can of worms and would allow various courts throughout the State, if you will, but to particularly or to individually evaluate the effectiveness of a plan adopted by a quasi legislative board under the authority of the State legislation.

"And there are other forms and other methods that can be done that will have a singular effect as opposed to the multiple effect that it would have if this kind of challenge could be made as an affirmative defense to a particular effort with regard to individual growers to eradicate, if you will, their particular infected trees.

"And it is not this Court's position that this Court has authority or jurisdiction at this point in time to reevaluate, to reassess the decisions that were made by that board in adopting and then renewing their specific plan. There [are] methods that can be—those plans can be challenged both at their inception whether it be in the original plan or a modification during a course of the board hearing and, thereafter, through appropriate litigation. As the Court indicated, it would have a singular effect and not have the potential of having multiple decisions by different courts under different circumstances concerning the efficacy of the plan and the appropriateness of the action . . . ."

Section 8557 requires the District's board of directors to "formulate an effective plan based on the best known and accepted methods for the control and eradication of the citrus pests within the district." Sun Pacific contends the People were required, but failed, to show that the Agency's eradication plan was effective. Sun Pacific's contention is flawed.

Civil Code section 3529 provides: "That which ought to have been done is to be regarded as done . . . ." In addition, it is presumed the law has been obeyed. (Civ. Code, § 3548; *Pinello v. Taylor* (1933) 128 Cal.App. 508, 512 [17 P.2d 1039]; *Ehlers v. Bihn* (1925) 71 Cal.App. 479, 487 [235 P. 673] [in absence of evidence to the contrary, presumption is that law was obeyed].) The Agency's plan, adopted pursuant to section 8557, is presumed to be effective. As a result, the People do not have to prove the effectiveness of the plan. They only need to show it was adopted pursuant to section 8557.

As recognized by the trial court, Sun Pacific should have objected to the eradication plan by following the District's protest procedures prior to adoption of its final budget. Section 8558 requires the district board to estimate the cost of operating its plan for the next fiscal year. The budget may only be adopted after a noticed hearing, prior to which any grower in the district may make a written protest to the budget or any item in it. (§§ 8560-8564.) The board must evaluate all protests at the hearing. (§ 8565.)

We recognize the statute is not well written and does not specifically state an eradication plan may be challenged at the budget hearing. Given the public health and safety issues inherent in the Pest Control Law, in addition to the policy of resolving disputes expeditiously, we find the general exhaustion rule applicable. (See *Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 510 [87 Cal.Rptr.2d 702, 981 P.2d 543] ["Administrative agencies must be given the opportunity to reach a reasoned and final conclusion on each and every issue upon which they have jurisdiction to act before those issues are raised in a judicial forum."].)

Therefore, we find the appropriate procedure for challenging a plan's effectiveness is to first exhaust one's remedies by challenging the budget before the district. If the challenge is not initiated then, the district has no opportunity to address the merits of the protest and to modify the plan (and the budget) accordingly. If we allowed growers to sit back and wait until some undisclosed future time to challenge the effectiveness of a plan, we would promote inconsistent and multiple results through litigation in different courts. The result would be to thwart the purpose of the Pest Control Law—the control and eradication of citrus pests.

In this case, the District was never given the opportunity to address Sun Pacific's contentions regarding the plan's lack of effectiveness for CTV eradication. Further, the District has been prejudiced by Sun Pacific's failure to raise its objection to the plan prior to its implementation, when the District could have addressed Sun Pacific's concerns and still made changes. Based on estoppel principles, the doctrine of laches, and the failure to exhaust administrative remedies, we find Sun Pacific is precluded from challenging the effectiveness of the Agency's plan. (See generally *Metcalf v. County of Los Angeles* (1944) 24 Cal.2d 267, 269 [148 P.2d 645] [party aggrieved by the application of a statute must exhaust administrative remedies before resorting to courts for relief]; *Marshall v. Marshall* (1965) 232 Cal.App.2d 232, 252 [42 Cal.Rptr. 686] [laches is an unreasonable delay in asserting right which causes prejudice to adverse party and renders granting of relief inequitable]; *Estate of Heigho* (1960) 186 Cal.App.2d 360, 369 [9 Cal.Rptr. 196] [equitable estoppel forbids a party to show existence of a fact when by his past conduct it would work an injustice to his adversary to permit him to do so].)

We conclude the trial court did not abuse its discretion in precluding evidence of the effectiveness of the Agency's plan for the control and eradication of CTV.

### C. Evidence relating to the petition to dissolve the District

In its 19th affirmative defense, Sun Pacific alleged the District has no standing to bring this action because a ballot petition was signed by a sufficient number of growers in Kern County to dissolve the District.

In granting the People's in limine motion to preclude evidence on the petition to dissolve the District, the court stated:

". . . [T]he particular governing board with regard to the activity that was conducted to try to either withdraw the district from the Joint Powers Agreement or to dissolve the district itself through the petition power; that was done but it has virtually no relevancy in this particular proceeding. As [Sun Pacific's counsel] indicated in his argument, the fact that that wasn't accomplished really doesn't have much to do with what we have here.

"And certainly, it is not a situation that goes unnoticed. However, it certainly is a situation that should have had that effort been desired to be carried to its final conclusion would have, I think, found its way into the litigation, again, having the singular effect of putting that issue squarely before the Court in a situation where it would be determined once and

for all and not just simply as an affirmative defense, if you will, to this particular situation. So that evidence in this Court's view would likewise be irrelevant."

In late 1995 and early 1996, a number of growers signed a petition to dissolve the District, pursuant to section 8751. The petition was submitted to the Kern County Board of Supervisors in June 1996, but was not approved, the board concluding the dissolution was subject to CEQA and LAFCO jurisdiction. The petitioners failed to pursue the matter with LAFCO or appeal. As a result, the District was never dissolved. At the time this lawsuit was filed, the District continued to operate pursuant to the Pest Control Law, with all applicable powers.

Sun Pacific argues LAFCO did not apply and, therefore, the evidence should have been admitted. The issue is irrelevant, as no further action was taken to dissolve the District. Because Sun Pacific chose not to pursue the dissolution, the District had both the authority and standing to pursue its action against Sun Pacific. We thus find the trial court did not abuse its discretion in excluding the evidence relating to attempts to dissolve the District.

*III., IV.**

. . . . . . . . . . . . . . . . . . . . . . . .

### Disposition

The judgment is affirmed with costs awarded to the People.

Dibiaso, Acting P. J., and Vartabedian, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 12, 2000.

---

*See footnote, *ante*, page 619.