Filed 4/2/13  Saad v. Hatziris CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RAMZY GIRGIS AWADA SAAD,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHN HATZIRIS,<br><br>    Defendant and Appellant. | G046068<br><br>(Super. Ct. No. 30-2010-00353507)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregory Munoz, Judge.  Affirmed.

Hager Dowling Lim & Slack, John V. Hager and Christine W. Chambers for Defendant and Appellant.

Law Offices of Gene J. Goldsman, Gene J. Goldsman, Arik Shafir, and Fernando Brito, Jr., for Plaintiff and Respondent.

John Hatziris (Hatziris) appeals from a judgment awarding Ramzy Girgis Awada Saad (Saad) damages for personal injuries Saad sustained during a low-speed traffic collision. A jury found Hatziris's negligent driving caused Saad's physical injuries and awarded $121,083 in damages for economic and noneconomic losses, including $75,000 for future medical expenses. After the trial court denied Hatziris's motion for a new trial, Hatziris filed this appeal, asserting the trial court erred by refusing to admit four sub rosa videos depicting Saad's activities on several days between October 2010 and June 2011. His contention lacks merit, and we affirm the judgment.

I

On December 31, 2009, Hatziris's car rear-ended Saad's car at the intersection of Center Drive and Beach Boulevard in Huntington Beach, California. Saad and Hatziris immediately proceeded to a nearby parking lot, where they exchanged contact information, inspected the damage to their vehicles, and attempted, although unsuccessfully, to have a police report taken to document the accident. During the exchange, which lasted approximately 30 minutes, Saad separately told Hatziris, a 911 dispatcher, and a California Highway Patrol officer that he did not need medical assistance. However, three and one-half months after the accident, Saad filed a personal injury lawsuit against Hatziris, alleging he suffered injuries during the low-speed collision that immediately caused him to suffer from neck and back pain, persistent dizziness, a ringing in his ears, and blurry vision.

At trial, Saad testified the symptoms he experienced immediately following the accident persisted throughout the rest of that day, so he went to the emergency room. Saad recalled he told the treating physician assistant that he was suffering from a headache, a persistent ringing in his ears, blurry vision, and pain in his neck and back. However, the physician assistant testified Saad only complained of a headache and neck pain during his physical examination.

After thoroughly examining Saad, and reviewing a CT scan and X-rays of his neck and back, the physician assistant determined Saad was not suffering from injuries that required immediate medical attention and prescribed him pain relief medications. The physician assistant also instructed Saad to see his regular doctor in a couple of days.

Saad testified he continued to suffer from headaches, blurry vision, a persistent ringing in his ears, and pain in his back and neck following his visit to the emergency room. Within a few weeks of the accident, Saad sought further treatment for his back and neck pain from an orthopedic surgeon, who prescribed physical therapy and prescription medications to treat his symptoms. Saad stated this treatment relieved his back pain but had no affect on his neck pain, which continued to get worse with time. Saad also received treatment from a neurologist he was referred to by the orthopedic surgeon. Saad recalled the treatment he received from the neurologist did not relieve his symptoms and his headaches continued to get worse.

When five months of physical therapy and prescription medications failed to relieve Saad's symptoms, the orthopedic surgeon ordered an MRI of his neck. The orthopedic surgeon testified the MRI revealed a herniated disc between two neck vertebrae and the fairly recent development of bone spurs. The orthopedic surgeon opined the injuries were likely due to Saad having suffered an acute trauma during the vehicle accident, rather than being the results of a long-term degenerative condition. The orthopedic surgeon also asserted the only way to repair Saad's neck injuries was to perform a surgical procedure. Furthermore, she recommended Saad have the surgery to repair his injuries and relieve his pain.

Saad testified he sought additional medical opinions on whether he should undergo the surgical procedure recommended by the orthopedic surgeon because he feared surgery; however, the two additional opinions he received affirmed the orthopedic surgeon's recommendation. One of the additional medical opinions he obtained was

3

from a neurosurgeon, who testified on his behalf during the trial. The neurosurgeon agreed with the orthopedic surgeon's conclusion that Saad's injuries originated from a recent trauma and were not the result of a long-term degenerative condition. The neurosurgeon also stated Saad's neck injuries, and the pain he was experiencing because of the injuries, would continue to get worse if he did not have the surgery. He estimated the surgery would cost approximately $75,000. Additionally, the neurosurgeon noted that, despite Saad's injuries and the related high levels of pain, Saad could still function and do many normal things with the assistance of pain medications.

During direct examination, Saad testified he was still experiencing headaches, a ringing in his ears, severe neck pain, and numbness in his arms and hands. Saad also stated the pain interfered with his day-to-day life by, among other things, preventing him from lifting heavy objects, working full time, sleeping for more than a few hours at a time, and participating in the recreational activities he used to enjoy.

On cross-examination, Saad testified he complained of an extensive list of symptoms during his first visit with his orthopedist.[1] Saad recalled he told the neurosurgeon he rated his neck pain "as a seven to eight on a scale of one to ten, ten being the most severe." Furthermore, Saad stated his neck pain continued to persist, which led to: (1) pain when turning his neck from side to side; (2) pain when holding a

---

[1] Saad testified he told his orthopedist that he suffered from: "nausea," "difficulty in concentration," "mindless staring," "sadness," "blurry vision," "disorientation," "confusion," "headaches," "attention problems," "appetite change," "dizziness," "balance problems," "difficulty walking," "being very tired," "dozing during the day," "personality change," "can't remember numbers," "poor attention," "difficulty learning new things," "difficulty understanding and remembering," "difficulty making decisions," "slurred speech," "depression," "change in sexual functioning," "hopelessness," "reduced confidence," "being impatient," "frustration," "wanting to be alone," "hearing problems," "change in sense of taste," "change in sense of smell," "difficulty with hand coordination," "difficulty planning or organizing," "easily distracted," "social withdrawal," "jaw pain," "pain when chewing," and "numbness and tingling in [his] legs and feet."

4

cell phone up to his ear; (3) difficulty pulling and pushing with his hands; (4) difficulty getting in and out of his car; and (5) pain when carrying things in his left hand, which sometimes resulted in him dropping the objects he was carrying. However, when Saad was subsequently questioned by his attorney, he clarified he had "good days and bad days" with regard to the level of pain he experienced and he sometimes did "something even though it causes [him] some pain."

During cross examination Saad also admitted he suffered injuries, including back injuries, during previous accidents; however, Saad noted he had completely recovered from those injuries before Hatziris rear-ended him. Specifically, Saad recounted he was involved in two separate car accidents in 2000, causing neck and shoulder injuries. Saad did not disclose this prior trauma to the orthopedic surgeon or the neurosurgeon who both recommended he have surgery and who both testified his injuries were the result of the more recent car accident. Additionally, Saad admitted he suffered a work-related back injury in 1990, and his physician recommended surgery to repair that injury. Saad, however, refused to undergo back surgery at that time, and he opined his back eventually healed.

Hatziris countered Saad's testimony, and the testimony of Saad's expert witnesses, with expert testimony from a neurologist who examined Saad and a neuroradiologist who examined the MRI taken of Saad's neck. The neurologist testified the injuries and pain Saad complained of were "out of proportion" with the objective findings of the exam he performed on Saad. He found "no objective evidence to support a pinched nerve in his neck or back." The neurologist also opined that due to all the inconsistencies between Saad's complaints and the objective evidence obtained during his examination, he believed Saad was exaggerating his injuries and the level of pain he was experiencing. The neurologist concluded the injuries Saad suffered during the vehicle accident did not require future care or a surgical procedure. And on

5

cross-examination, the neurologist asserted the injuries depicted in the MRI of Saad's neck were the result of long-term degenerative changes.

Like the neurologist, Hatziris's expert neuroradiologist concluded the injuries to Saad's neck were the result of a long-term degenerative process, and not caused by a recent traumatic event. However, because it was not his area of expertise, the neuroradiologist offered no opinion on whether it was necessary or advisable for Saad to undergo surgery.

On the final day of trial, and after Saad had been excused as a witness, Hatziris's attorney presented four sub rosa videos to the court, asserting they were admissible under Evidence Code section 780[2] to impeach Saad's testimony. The sub rosa videos were taken on October 28, 2010; October 29, 2010; November 17, 2010; November 23, 2010; January 6, 2011; June 15, 2011; and June 16, 2011. The footage depicted Saad walking short distances, opening and closing a rolling driveway gate at his home, driving his vehicle, smoking a cigarette, talking on his cell phone, squatting to repair an ATM machine, and holding items in his left hand. During argument on the admissibility of the videos, Hatziris's attorney asserted the videos were admissible as evidence to impeach Saad's testimony about the extent of his injuries and the level of pain he experienced as a result of those injuries.

After taking an hour to view all four sub rosa videos, the court sustained Saad's objection to their admission, citing section 352. More specifically, the court excluded the sub rosa videos because it found the probative value of the videos was substantially outweighed by the likelihood the presentation of the videos to the jury would necessitate an undue consumption of time. The court determined the videos did not depict "anything significant to impeach the plaintiff's testimony concerning his injuries and his disability," and thus, their presentation would be "a waste of time."

---

[2] All further statutory references are to the Evidence Code.

6

Furthermore, the court agreed with Saad's attorney that the videos had minimal probative value because they would simply show the jury what it could already observe Saad doing in court during the trial. Moreover, the videos did not impeach Saad's testimony because he had clarified he could still do the things depicted in the videos while taking medications to limit his pain.

The day after the jurors began deliberations, they informed the court they believed they had reached an insurmountable stalemate as to one of the questions in the instructions, i.e., whether Saad should be awarded future medical expenses. The foreperson reported seven jury members were opposed to awarding any future medical expenses and five jury members were in favor of awarding the expenses. The court instructed the jurors to continue their deliberations and encouraged them to do their best to arrive at a verdict.

After spending the rest of the morning and a portion of the afternoon deliberating, the jury informed the court it had reached a verdict in Saad's favor and awarded him $11,083 for his previously paid medical expenses, $75,000 for his future medical expenses, and $35,000 for his past noneconomic loss. Hatziris's attorney requested the jury be polled, which revealed that, ultimately, 10 members were in favor of awarding Saad damages for future medical expenses and two members were opposed.

Following the jury's verdict, Hatziris filed a motion for a new trial, arguing the court's exclusion of the four sub rosa videos prevented him from receiving a fair trial. In response to Hatziris's motion, the court stated: "In my 47 years of practicing [and] trying cases, I've seen a number of sub rosa films. This is probably the weakest one I've ever seen." Furthermore, the court concluded the four videos did not show "any impeachment whatsoever" and, because the videos presented no new facts, there was "no point" in spending "40 to 55 minutes" presenting the videos to the jurors before they began their deliberations. For those reasons, the court denied Hatziris's motion for a new trial.

7

## II

Hatziris contends the trial court abused its discretion under section 352 by excluding the four sub rosa videos he attempted to admit under section 780. He asserts the videos impeach Saad's testimony about the extent of his injuries and his level of pain. He also asserts the court's determination the probative value of the videos was substantially outweighed by the probability the presentation of the videos would have necessitated an undue consumption of time exceeded the bounds of reason, and thus, the judgment should be vacated and the court should be ordered to proceed with a new trial. We disagree.

Section 352 authorizes the trial court to exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will, among other things, necessitate an undue consumption of time. "Under . . . section 352, the trial court enjoys *broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue* prejudice, confusion or *consumption of time*. [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124, italics added.) Where, as here, a statute expressly vests a trial court with a broad discretionary power, the "'exercise of that wide discretion must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 828 (*Gutierrez*).) The trial court's "'discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered.'" (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 640 (*Lockyer*).)

Applying this standard, we find no abuse of discretion. The four sub rosa videos present brief, shaky, and seemingly random segments of Saad walking very slowly, sliding his driveway gate open and closed, holding a folder, smoking a cigarette,

8

performing his work as an ATM repairman, and driving his vehicle. The video segments do not evidence whether Saad is or is not experiencing pain or discomfort while performing these activities, nor do the segments prove whether or not Saad actually has a serious neck injury.

Importantly, the trial record reveals Saad did not testify he cannot perform the activities depicted in the videos. Rather, Saad testified he could perform the activities depicted in the videos while taking pain relief medications prescribed by his doctors. Furthermore, the record reflects Saad clarified he has "good days and bad days" with regard to the pain he experiences, and he sometimes performs certain activities even though it causes him pain. Saad never claimed he was unable to walk, open his gate, or smoke a cigarette. In fact, he testified he continues to take walks around his neighborhood for exercise, often smokes cigarettes throughout the day and night, regularly travels to doctors' appointments, and continues to work a few days a week as an ATM repairman. He explained his job requires him to drive to ATM locations and to sometimes hire an assistant to lift heavy machines for him.

The court took approximately one hour to review the four sub rosa videos in their entirety, and considered argument regarding their admissibility. The court reasonably concluded the videos had minimal probative value because the jury could observe Saad performing the same activities depicted in the video footage throughout the trial, and the videos did not contradict Saad's trial testimony regarding his injuries or the level of pain he was experiencing.

In light of the court's reasonable determination the videos had minimal probative value, it was also reasonable for the court to conclude the probative value of the videos was substantially outweighed by the likelihood the presentation of the videos to the jury would have necessitated an undue consumption of time. After carefully reviewing all the testimony and evidence presented during the trial, it cannot be said the court's decision to exclude the videos under section 352 was "arbitrary, capricious or

9

patently absurd." The ruling was well within the "bounds of reason." (See *Gutierrez, supra*, 45 Cal.4th at p. 828; *Lockyer, supra*, 77 Cal.App.4th at p. 640.)

On appeal, Hatziris contends the court abused its discretion simply because the videos are relevant, probative, and brief. He misconstrues the discretionary authority section 352 vests in trial courts. As stated above, pursuant to section 352, trial courts are authorized to exclude certain evidence that is otherwise relevant and probative to shield the trial process and jury from evidence likely to prejudice a party to the case, confuse the issues of the case, mislead the jury, or consume an unnecessary amount of time.

Finally, citing *People v. Minifie* (1996) 13 Cal.4th 1055, 1070 (*Minifie*), Hatziris contends the trial court's exclusion of the four sub rosa videos under section 352 was an abuse of discretion because it stripped him of a fundamental portion of his defense as to primary issues of the case, i.e., the extent of Saad's injuries and Saad's truthfulness regarding his level of pain. In *Minifie*, our Supreme Court reviewed an assault with a deadly weapon conviction. (*Id*. at p. 1061.) Defendant shot his gun multiple times at a man after the man punched him in the face. (*Id*. at pp. 1060-1061.) Defendant argued the trial court prevented him from presenting his claim of self-defense by improperly excluding evidence victim was a close friend of a violent and dangerous family that had repeatedly threatened to kill him. (*Id*. at pp. 1061-1063.) Defendant also was prevented from presenting evidence he was threatened and attacked by associates of the family while incarcerated, and he traveled in secret to avoid being attacked by the family. (*Ibid*.)

The trial court excluded the evidence as inadmissible character evidence under section 1100. (*Minifie, supra*, 13 Cal.4th at pp. 1062-1063.) Additionally, the court ruled that if the evidence was admissible under section 1100, it would be excluded under section 352 as "substantially more prejudicial than probative" because "an undue amount of time would be consumed identifying the [violent family's] friends and the

10

group's violent acts, and that such evidence would tend to confuse the jury." (*Id*. at p. 1063.)

The Supreme Court reversed this ruling, holding "evidence of third party threats is admissible to support a [criminal defendant's] claim of self-defense if there is also evidence from which the jury may find that the defendant reasonably associated the victim with those threats." (*Minifie, supra*, 13 Cal.4th at p. 1060.) With regard to the issue of whether the evidence was properly excluded under section 352, the Supreme Court held the trial court abused its discretion because the defendant should have been afforded the opportunity "to argue that the perceptions of a reasonable person in his position would have been colored by the [third parties'] threats and their reputation for violence." (*Id*. at p. 1070.) The Supreme Court explained the probative value of the evidence of third party threats and defendant's state of mind when he committed his crimes were not substantially outweighed by the considerations of section 352, especially if defendant had reason to fear for his life. (*Id*. at pp. 1070-1071.)

We find the *Minifie* case inapt. Unlike the defendant in *Minifie*, Hatziris was not prevented from presenting substantial evidence as to primary issues of his case. Hatziris's attorney took full advantage of the opportunity to question Saad about the extent of his injuries and the level of pain he claimed to experience. Additionally, Hatziris presented the testimony of two expert witnesses who provided medical opinions about the extent of Saad's injuries and his likely pain. Moreover, unlike the relevant and extremely probative evidence excluded in *Minifie*, the court reasonably concluded the four sub rosa videos had minimal probative value because they did not serve to impeach Saad's testimony regarding his injuries or the level of pain he was experiencing. In short, the court's exclusion of the videos did not unduly prevent Hatziris from presenting his defense. For these reasons, we conclude that the court did not abuse its discretion under section 352 by excluding the sub rosa video evidence.

11

### III

The judgment is affirmed.  Respondents shall recover their costs on appeal.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.

12